Garland Rex BRINLEE, Jr., Petitioner-Appellant,

v.

Richard A. CRISP, Warden, and the State of Oklahoma, Respondents-Appellees.

No. 77–1689.

United States Court of Appeals, Tenth Circuit.

Argued Jan. 23, 1979.

Decided Nov. 1, 1979.

Douglas McKay Kerr, Denver, Colo., for petitioner-appellant.

David W. Lee, Asst. Atty. Gen., Oklahoma City, Okl., (Larry Derryberry, Atty. Gen., of Oklahoma, Oklahoma City, Okl., Kaye Karen Kennedy, Asst. Atty. Gen., Oklahoma City, Okl., with him on the brief), for respondents-appellees.

Before HOLLOWAY, BARRETT and DOYLE, Circuit Judges.

HOLLOWAY, Circuit Judge.

Garland Rex Brinlee, Jr., petitioner-appellant, appeals from a judgment denying his petition for a writ of habeas corpus. Appellant was convicted in the Oklahoma courts, following a jury trial, of the murder of Dorotha Fern Bolding. He is serving a life sentence at the Oklahoma State Penitentiary at McAlester. Mrs. Bolding died when a bomb exploded under her pick-up truck in the driveway of her Bristow, Oklahoma, home.

Appellant took a direct appeal from the murder conviction to the Oklahoma Court of Criminal Appeals. During the pendency of that appeal Brinlee escaped from the Oklahoma State Penitentiary and his conviction for that escape was affirmed. *Brinlee v. State*, 543 P.2d 744 (Okl.Cr.). The Court of Criminal Appeals dismissed appellant Brinlee's direct appeal of the murder conviction on the ground that appellant was a fugitive from justice and beyond the jurisdiction of the court. *Brinlee v. State*, 513 P.2d 343 (Okl.Cr.).[1]

After he was returned to the penitentiary appellant filed an application for post-conviction relief in the state court. That post-conviction action was likewise dismissed because the issues presented were those which Brinlee had raised in his direct appeal, which had been dismissed, as noted above.

---

1. By a similar ruling the Eighth Circuit dismissed an appeal by Brinlee from conspiracy and substantive convictions under the federal firearms statutes, due to Brinlee's being a fugitive. *Brinlee v. United States*, 483 F.2d 925 (8th Cir.), *cert. denied*, 419 U.S. 878, 95 S.Ct. 142, 42 L.Ed.2d 118. Later that appeal was considered on the merits and the convictions were affirmed, apparently after Brinlee was again in custody. *Brinlee v. United States*, 496 F.2d 351 (8th Cir.), *cert. denied*, 419 U.S. 878, 95 S.Ct. 142, 42 L.Ed.2d 118.

Dismissal of that state post-conviction action was appealed and Brinlee escaped again in 1976 during the pendency of that appeal. Although the State moved to dismiss that post-conviction appeal, the Oklahoma Court of Criminal Appeals retained jurisdiction because of Brinlee's return to custody from that second escape. The court affirmed the state district court's dismissal of the post-conviction case as to ten claims on the theory that defendant's first escape which resulted in a dismissal of his direct appeal of the murder conviction was a waiver of all errors alleged in that appeal; as to the remaining two claims the court affirmed on the basis that the claims lacked merit. *Brinlee v. State*, 554 P.2d 816 (Okl. Cr.).

Following the exhaustion of state remedies appellant Brinlee filed the instant federal *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Twelve grounds were asserted in this action, framed by appellant as follows: (1) the Oklahoma trial court committed error in denying a change of venue, forcing the defendant to go to trial in an environment of people with saturated minds of "ill publicity"; (2) petitioner has been denied a fair and impartial trial for the reason that veniremen were improperly excluded after stating objection to the imposition of capital punishment and excluding or disqualifying all people who disagreed with the summation of the district attorney's theory on humanity for cause; (3) the trial judge "race-horsed" the trial, denying defendant the right to be present to face his accusers, witnesses and jurors and denying defense counsel the privilege to properly cross-examine witnesses and jurors; (4) the assistant attorney general discussed other crimes that were moot to the crime at bar; (5) no *Miranda* rights were read to appellant and the admission of improperly obtained statements deprived him of his Fifth Amendment constitutional rights; (6) the trial judge committed error in making comments on the evidence throughout the trial, showing the weight he believed the jury should give the evidence and invading the province of the jury; (7) the court committed error in permitting evidence of other crimes to be introduced; (8) the court erred in denying defendant's demurrer to the evidence and a variance was shown in the State's evidence; (9) error was committed when the trial court permitted the State to ask hypothetical questions not based on facts before the jury; (10) the trial judge became an advocate for the prosecution and his instructions were in the nature of a closing argument; (11) appellant was denied due process by the dismissal of his original appeal and ineffectiveness of counsel; and (12) the State used false and insufficient evidence to prosecute the appellant.

The federal district court considered the pleadings before him and the record of the State trial proceedings. On this basis, but without an evidentiary hearing, habeas relief was denied and this appeal followed.

 It would appear that some of the claims alleged as federal claims may be nothing more than claims of error under state law. Without more, such claims of state procedural or trial errors do not present federal questions cognizable in a federal habeas corpus suit. *Bond v. State of Oklahoma*, 546 F.2d 1369, 1377 (10th Cir.). However, a state prisoner is entitled to relief in a federal habeas suit if he demonstrates state court errors which deprived him of fundamental rights guaranteed by the Constitution of the United States. *See Hickock v. Crouse*, 334 F.2d 95, 100 (10th Cir.), *cert. denied*, 379 U.S. 982, 85 S.Ct. 689, 13 L.Ed.2d 572; *Mathis v. People of State of Colo.*, 425 F.2d 1165, 1166 (10th Cir.); *see Snow v. State of Oklahoma*, 489 F.2d 278 (10th Cir.). We will therefore consider appellant's claims to determine whether any of them involve errors of such constitutional magnitude that they are valid federal habeas claims.

I

*Pre-trial publicity and venue*

Appellant argues that he was denied a fair trial because of excessive pre-trial publicity. The bombing took place in Bristow, Oklahoma, and the trial originally was to

have been held in nearby Sapulpa, Oklahoma, about 18 miles from Bristow. Appellant's first motion for a change of venue was granted and the trial was moved to Okmulgee, Oklahoma, about 32 miles from Bristow. A second motion to change venue from Okmulgee was denied.

At the hearing on the second motion for change of venue reference was made to a large number of newspaper clippings which had been submitted to the state judge at Sapulpa who granted the first change of venue. (II R. 3–4). That material was not located then (*id.* at 7), and it is not in our record and appellant's brief makes some complaint of ineffectiveness of trial counsel in that regard. (Opening Brief of Appellant, 13–14). In any event, there was a hearing on the second motion for change of venue on October 27, 1971. The trial judge who heard that motion stated that there was some difference between the counties, that there were "no demonstrations or anything like that . . .," that the people generally took what was read "with a grain of salt . . .," and the court observed that if a jury could not be obtained, then the case would have to be transferred. (II R. 9–10). The motion for the second change of venue was denied. (*Id.* at 12–13). At that hearing the court did direct that attorneys in the case not appear on any kind of program and not give out publicity, emphasizing the defendant's right to "a fair and impartial trial without it being tried in the newspapers." (*Id.* at 36).

The voir dire of the jury panel at the trial which began November 15, 1971, as well as the granting of the first motion for a change of venue, bear out the claim that there was a substantial amount of publicity surrounding the crime and subsequent events. (I R. 48–53, 113, 116) (Petition for Writ of Habeas Corpus, VI R. 34–37). And a related federal criminal case against appellant was transferred on appellant's motion from the Northern District of Oklahoma to the District of New Mexico, the distance there obtained being about 545 miles—from Tulsa to Albuquerque.

In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors. *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751; *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 551, 96 S.Ct. 2791, 49 L.Ed.2d 683. In balancing the rights of the defendant with the rights of the press to freely report, the Supreme Court emphasized in *Irvin v. Dowd, supra*, 366 U.S. at 722–23, 81 S.Ct. at 1642–43:

It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. (Citations omitted).

The Court further cautioned, however, that (*id.* at 723, 81 S.Ct. at 1643):

The adoption of such a rule, however, 'cannot foreclose inquiry as to whether, in a given case, the application of that rule works a deprivation of the prisoner's life or liberty without due process of law.' *Lisenba v. [People of State of] California*, 314 U.S. 219, 236 [, 62 S.Ct. 280, 290, 86 L.Ed. 166]. As stated in *Reynolds* [*Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244], the test is "whether the nature and strength of the opinion formed are such as in law necessarily . . . raise the presumption of partiality. The question thus presented is one of mixed law and fact . . .." At p. 156 [of 96 U.S.]. 'The affirmative of the issue is upon the challenger. Unless he shows the actual existence of such

an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside . . . .. If a positive and decided opinion had been formed, he would have been incompetent even though it had not been expressed.' At p. 157 [of 98 U.S.]. As was stated in *Brown v. Allen*, 344 U.S. 443, 507, [73 S.Ct. 397, 446, 97 L.Ed. 469] the "so-called mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication with the federal judge." It was, therefore, the duty of the Court of Appeals to independently evaluate the voir dire testimony of the impaneled jurors.

Therefore we must consider the record with care. That record includes the voir dire examination to aid us in deciding whether the due process standards laid down by the Supreme Court are satisfied. *Welch v. United States*, 371 F.2d 287, 292 (10th Cir.), *cert. denied*, 385 U.S. 957, 87 S.Ct. 395, 17 L.Ed.2d 303. The jurors' assurances that they are equal to the task are not dispositive of the rights of the accused and it remains open to a defendant to demonstrate "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." *Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589. In the *Murphy* case the Court examined the voir dire for an indication whether such hostility was present, *id.* at 800–803, 95 S.Ct. 2031, and our analysis here will focus primarily on the voir dire also.

As noted, the record before us does not include the publications from the Tulsa newspapers which petitioner alleges were inexplicably lost after his original motion for a change of venue was heard. We nevertheless agree that the record shows that there was a substantial amount of pre-trial and trial publicity. The opinion of the federal district judge who denied the instant habeas petition states that "[i]t cannot be denied that considerable publicity attended the trial of petitioner in Okmulgee, Oklahoma. Neither can it be denied that Okmulgee is within the circulation area of the two Tulsa newspapers and of its television stations." (VI R. 220). However, despite the lack of the clippings and of an evidentiary hearing, we believe that the record we have is sufficient to enable us to consider the merits of the claim as made by appellant since the record does contain the extensive voir dire examination.

The voir dire record of over 450 pages (I R. 8–500) shows that 118 jurors were available for voir dire examination. Of those, 96 were actually called and examined and, for reasons explained below, only 47 were specifically questioned about exposure to pre-trial publicity and its effect on them. Fifty-one persons were excused for cause due to their refusal to consider the death penalty. One person was excused for medical problems. The State used five peremptory challenges and the appellant used eight, waiving one such challenge.

Of the 96 persons questioned, 49 were not asked whether they had been exposed to pre-trial publicity. All of these persons voiced objections to the death penalty early in their questioning and were immediately excused for cause on this ground. Of the 47 persons actually questioned about exposure to pre-trial publicity, 45 said that they had been exposed to some publicity, although many stated that the exposure was minimal. Two persons had not been exposed to any publicity. Eight of the 45 specified that their exposure had been solely through television while two indicated it was through newspapers. Thirty-five persons testified that they were exposed both to television and newspaper reports or gave non-specific answers, *e. g.*, answering affirmatively when asked whether they had "seen or heard" anything about the case.

Only five prospective jurors were asked specifically whether they subscribed to Tulsa newspapers. None of the five did subscribe and only one of the five testified about buying it occasionally.

The testimony of the 12 jurors and the one alternate juror Allen who were ultimately selected (the alternate was called on to function in the jury's decision) shows that all had been exposed to some publicity.

Four specifically stated that they had been exposed to very little publicity. (Jurors Butler, Hott, Summers, and Miller, *see* I R. 260, 317–321, 329–332, 409–414). All indicated that their decisions would be made on the evidence presented in the courtroom, disregarding anything heard elsewhere. Only one of these thirteen said he had any opinion. We note that as to this juror, Mr. Butler, who was the foreman of the jury, parts of his responses do cause some concern. This is because of his statement at one point that he had some opinion; that "[t]he fact that we're here would tend to point in one direction or another," (I R. 261); that it would take evidence by the State to "fix" his opinion. (*Id.* at 262). Nevertheless, he gave clear responses that he had no fixed opinion of guilt or innocence, that he would rely only on the evidence and the instructions, that he presumed appellant to be innocent of the charge, and that it would take substantial evidence beyond any reasonable doubt to convict appellant. (*Id.* at 161, 260, 262–63).[2] Juror Butler was not challenged for cause, (I R. 263, 267), and, in fact none of the jurors who decided the case were challenged for cause.

■ We are satisfied that Mr. Butler's responses as a whole and those of other jurors who participated in the verdict reveal that a fair and impartial jury was chosen under the standard of *Irvin v. Dowd* and the other constitutional decisions of the Supreme Court.[3] It is true that in *Murphy v. Florida, supra,* 421 U.S. at 803, 95 S.Ct. at 2037, the Court stated that "[i]n a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations may be drawn into question; for it is then more probable that they are part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by

it." We do not feel that this record "suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." *Id.* at 803, 95 S.Ct. at 2038.

As mentioned, at the time the second motion for a change of venue was denied the trial judge noted the differences between Okmulgee County, in which Okmulgee is situated, and Creek County, in which Bristow and Sapulpa are located. He remarked that Okmulgee County is more rural and has very little intercourse with Creek County. He also observed that Creek County was not only less rural but was also closer to Tulsa, the closest source of much of the publicity surrounding the case. (II R. 8–12). Tulsa is approximately 40 miles from Okmulgee.

■ We feel that the record does not demonstrate that the setting of the trial was inherently prejudicial or that the jury selection process permits an inference of actual prejudice, *Murphy v. Florida, supra,* 421 U.S. at 803, 95 S.Ct. 2031, which is the constitutional test. A comparison of this case with the facts set out in *Murphy v. Florida, supra,* 421 U.S. at 803, 95 S.Ct. 2031 and *Irvin v. Dowd, supra,* 366 U.S. at 727, 81 S.Ct. 1639, bears out this conclusion. In *Irvin v. Dowd,* where the constitutional claim of denial of an impartial jury was upheld, 90% of the prospective jurors examined on the point had some opinion on the accused's guilt and eight of the twelve who decided the case had formed an opinion that the defendant was guilty before trial began. *Id.* at 727, 81 S.Ct. 1639. In *Murphy v. Florida,* where the Court held that the claim of denial of a fair trial was not established, 20 of the 78 persons questioned were excused because they indicated an opinion on guilt. In our case, 19 persons indicated an opinion of appellant's guilt out of 47

---

**2.** The voir dire of Juror Butler is reproduced in the Appendix to this opinion.

**3.** The jurors' responses for the twelve jurors and alternate Allen support this conclusion in our opinion. *See* response of jurors York, I R. 99–106, 250–52; Condren, *id.* 114–18, 247–50; Hill, *id.* 121–27, 252–54; Butler, *id.* 158–163, 260–63 (in Appendix); Keck, *id.* 190–98; Hott, *id.* 315–23; Summers, *id.* 327–332; Wolfe, *id.* 359–67; Nick, *id.* 369–78; Buzan, *id.* 391–99; Miller, *id.* 407–414; Cargill, *id.* 471–78 (excused); and Allen, *id.* 492–500.

persons questioned specifically about exposure to pretrial publicity, 96 jurors being questioned in all. The Court stated in *Murphy, supra*, 421 U.S. at 803, 95 S.Ct. at 2038:

> This may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own.

Moreover, the dissent in *Murphy* noted the "crucial significance of the fact that at no time before or during this daily buildup of prejudice against Murphy did the trial judge instruct the prospective jurors not to discuss the case among themselves. Indeed the trial judge took no steps to insulate the jurors from media coverage of the case or from the many news articles that discussed petitioner's last criminal exploits." 421 U.S. at 807, 95 S.Ct. at 2040–41. During the voir dire and the trial itself, the trial judge in the instant case carefully instructed the jury panel not to discuss the case among themselves or with anyone else. (*E. g.*, I R. 38, 127, 334, 415, 482, 505, 651–52). As noted, the judge further instructed the lawyers for both sides not to release publicity on the case over two weeks before the trial began. (II R. 36). And the jury was sequestered during the trial itself. (I R. 503). As the Court stated in *Nebraska Press Ass'n. v. Stuart*, 427 U.S. at 555, 96 S.Ct. at 2801:

> [T]he measures a judge takes or fails to take to mitigate the effects of pretrial publicity . . . may well determine whether the defendant receives a trial consistent with the requirements of due process.

While the federal district court's decision in the Northern District of Oklahoma to grant this appellant a change of venue from Tulsa to Albuquerque in a federal case might seem inconsistent with our decision here, we cannot agree that the two rulings are incompatible.[4] First, Tulsa is a rela-

tively large urban community and Okmulgee is somewhat removed from that setting. Among other things, appellant's brief points to the extensive news coverage of the case found in two Tulsa newspapers. Yet of the five prospective jurors who were asked specifically whether they subscribed to a Tulsa newspaper, none did and only one testified that he occasionally read a Tulsa paper. Thus, factors indicating a change in venue from Tulsa to Albuquerque would not establish a constitutional compulsion to avoid the State trial of appellant in Okmulgee.

Further, an additional factor distinguishing the two cases is the fact that in this case we have the benefit of hindsight. We need not determine whether petitioner might get a trial by an impartial jury; we have the benefit of the voir dire examination which shows the responses of actual jurors that they could give the appellant a fair trial. And there is no showing here of a circus atmosphere which would compel a reversal. *Cf. Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543, and *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600.

In sum, we conclude that appellant has not demonstrated a violation of the constitutional guarantee of a fair trial by an impartial jury.

## II

*The claim of improper exclusion of veniremen who stated an objection to imposition of capital punishment*

■ Appellant argues that the elimination of veniremen who could not impose the death penalty, even if the law and evidence warranted it, denied him a fair and impartial jury.

In voir dire of the potential jurors the State asked each juror individually if they could consider both the penalty of life imprisonment and the death penalty. Those who could not were then asked if they could agree to a verdict imposing the death penal-

---

4. We note also that in a federal firearms case against appellant a change of venue was granted from the Northern District of Oklahoma to the district of North Dakota. (VI R. 115, 146, *et seq.*).

ty if the law and evidence warranted, and anyone who could not was challenged for cause and excluded. (*E. g.,* Juror Thompson, I R. 390–91). Appellant contends that such a process of selection resulted in a jury which was more prosecution prone, one which was not drawn from a cross-section of the community, and one which was uncommonly willing to condemn a man to die. (Petition for Writ of Habeas Corpus, VI R. 38–40; Brief of Appellant, 15–16).

In *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, the Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." (*Id.* at 522, 88 S.Ct. at 1777). However in *Bumper v. North Carolina,* 391 U.S. 543, 545, 88 S.Ct. 1788, 20 L.Ed.2d 797, the Court held that the decision in *Witherspoon* does not apply where only a life sentence is recommended by the jury. *See also Witherspoon v. Illinois, supra* 391 U.S. at 522–23, n. 21, 88 S.Ct. 1770; *Redford v. Smith,* 543 F.2d 726 (10th Cir.); *Sinclair v. Turner,* 447 F.2d 1158 (10th Cir.), *cert. denied,* 405 U.S. 1048, 92 S.Ct. 1329, 31 L.Ed.2d 590. Here the jury set the punishment at imprisonment at hard labor for life, (V R. 478; *see* 21 O.S. 1971 § 707), and a life sentence was imposed. (*Id.* at 494). We therefore hold that under *Bumper* and the other cases cited this claim of appellant lacks merit.

### III

*The claim that the trial was conducted with excessive haste and in part in the absence of appellant*

Appellant argues that the trial judge "race-horsed" or prodded defense counsel to proceed quickly with the trial. He says that this denied him a fair trial and that at times the record does not show that appellant had appeared or returned to the courtroom.

At several points appellant's counsel paused in the course of his cross-examina-

tion and the judge asked him to go ahead with it. (I R. 822–23). On another occasion the judge commented that rereading a cross-examination question for the benefit of the prosecutor was not needed because it was "immaterial anyhow." (I R. 1264). Another action complained of was the court's direction to the prosecutor to "get on" with his case and to stop asking Brinlee general questions, apparently in an attempt to terminate exchanges between appellant and the prosecutor over how questions should be asked. (I R. 1435).

It is well established that state court trial errors not involving a violation of federal constitutional rights are not cognizable in a federal habeas case. *Gillihan v. Rodriguez,* 551 F.2d 1182 (10th Cir.), *cert. denied,* 434 U.S. 845, 98 S.Ct. 148, 54 L.Ed.2d 111. We feel that the remarks complained of do not involve such federal constitutional problems. However one claim which requires some discussion is the assertion concerning the lack of a record showing of defendant's presence at some points in the trial. This is significant because of the basic right of the accused to be present at every stage of his trial. *See Diaz v. United States,* 223 U.S. 442, 454–55, 32 S.Ct. 250, 56 L.Ed. 500; *Illinois v. Allen,* 397 U.S. 337, 342–43, 90 S.Ct. 1057, 25 L.Ed.2d 353; *Ellis v. State of Oklahoma,* 430 F.2d 1352, 1354 (10th Cir.), *cert. denied,* 401 U.S. 1010, 91 S.Ct. 1260, 28 L.Ed.2d 546. For a leading principle of criminal procedure is that after the indictment is found, "nothing shall be done in the absence of the prisoner." *Lewis v. United States,* 146 U.S. 370, 372, 13 S.Ct. 136, 137, 36 L.Ed. 1011.

Appellant's argument is that the state trial transcript does not affirmatively show that he was present at several points during the trial. Appellant does not in fact say that he was not present while the trial proceeded. In his federal habeas petition he alleges that he does not know how much trial proceeded out of his presence on one occasion on November 16, 1971, for he was in jail upstairs. (VI R. 211). At this point in the voir dire when court proceedings

began on November 16 his counsel advised the court that "[w]e don't have the defendant yet," and the prosecuting attorney made a like statement. (I R. 336). The trial judge stated that he thought the defendant was present, but then said they should call "and see if they're going to bring him down." The record does not state whether the defendant appeared in court before the proceedings resumed. However, his counsel continued to participate, without any further remark about defendant being absent.[5]

As to other instances, defendant merely asserts that the trial transcript does not show his presence. (E. g., VI R. 46). His brief also lists several pages in the trial transcript which do not reflect that he was present when trial resumed after overnight recesses or other recesses.

Appellant relies in particular on *Lewis v. United States,* 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011, and its statements of the requirement that the record affirmatively show the defendant's presence. *Id.* at 372–73, 13 S.Ct. 136. There on a direct appeal the Court concluded that the record did not affirmatively show the defendant's presence, that a fair reading led to the opposite conclusion, and that the prisoner was not brought face to face with the jury until after the challenges were made and the selected jurors were brought in to be sworn. Thus reading the record, and holding that the making of the challenges was an essential part of the trial, and that defendant had the right to be brought face to face with the jurors when the challenges were made, the Court held that the record disclosed an error for which the judgment had to be reversed. *Id.* at 375–76, 13 S.Ct. 136.

As noted by the federal district court which denied the instant habeas petition, appellant's presence at the trial was established numerous other times. The record reflects appellant's presence on November 15, at the beginning of the trial. (I R. 3). Appellant was also identified in open court on November 16 (I R. 543), on November 17 (I R. 834, 840, 848, 860, 921, 979, 1011, 1027), and on November 18 (I R. 1078, 1087–88, 1096, 1101). He took the witness stand in his own behalf on November 18. (I R. 1318–1448). The record also shows his presence at formal sentencing on November 29. (I R. 1696). But most importantly, appellant simply does not affirmatively allege or show that he was actually absent while the trial proceeded, which he could have done by information from trial counsel or other sources. Since appellant did not make such a showing as one collaterally attacking his conviction must do, *Miller v. Crouse,* 346 F.2d 301, 307 (10th Cir.), *see Woods v. Munns,* 347 F.2d 948, 951 (10th Cir.), his claim is without merit.

We are satisfied that appellant's various arguments on this third proposition do not demonstrate any violation of his constitutional rights.

## IV

### The claim of improper evidence of other crimes

Appellant maintains that a considerable portion of the 1,699 page trial transcript is devoted to matters other than the Bristow bombing; that the prosecutor introduced several of these matters without the faint-

---

**5.** The record states (I R. 336):

NOVEMBER 16, 1971

(The following proceedings were had at 9:00 A.M.:)

THE COURT: All right. Court will be in session. Be seated. All right, did you want to dictate your business into the record out of the hearing of the jury?

MR. FERGUSON: Your Honor, if I may.

MR. BROWN: We don't have the defendant yet.

MR. FERGUSON: Defendant isn't here yet, Your Honor.

THE COURT: I thought he was sitting in here. You better go call and see if they're going to bring him down.

All right. Do you want to make your record out of the hearing of the jury?

(Whereupon the following proceedings were had OUT OF THE HEARING of the prospective jurors:)

MR. FERGUSON: May it please the Court, for the purposes of the record only—

est excuse of showing a common plan, scheme, motive or design; that no less than three experienced law enforcement officers "blurted out" remarks about other alleged offenses involving appellant; and that a hypothetical question assuming such other alleged crimes by appellant was clearly improper, all making the trial a mockery of justice. (Opening Brief of Appellant, 7–8, 18).

It is true that there were numerous references to other offenses or wrongful conduct by appellant. In the prosecutor's opening statement reference was made to the forthcoming testimony concerning an escape attempt by appellant. There also was reference to the murder of one Pete English, another local tavern operator. In addition, testimony was developed about a "Bliss bombing" and a "boat charge" against appellant. Further, the testimony by officer Wilkerson of the Oklahoma State Bureau of Investigation concerning an interview at a motel with appellant related a rejection by appellant of advice of his rights, appellant stating that he should have a degree in law and that at one time he had had 27 felony cases against him. (I R. 870–71). Finally, there was a hypothetical question put to Dr. Shadid, a psychiatrist, whether an individual who had many brushes with the law and had escaped punishment for many crimes for which he had been responsible for ten or eleven years would have a tendency to brag about such crimes and would fall within the classification of a sociopath. (I R. 1499–1501).

■■■■ Again we are concerned only with whether federal constitutional rights were infringed. State court rulings on the admissibility of evidence may not be questioned in federal habeas proceedings unless they render the trial so fundamentally unfair as to constitute a denial of federal constitutional rights. *Gillihan v. Rodriguez,* 551 F.2d 1182, 1192–93 (10th Cir.), *cert. denied,* 434 U.S. 845, 98 S.Ct. 148, 54 L.Ed.2d 111. Evidence of other crimes, while generally inadmissible, may be admitted to prove intent, identity, motive, absence of mistake and common scheme or

plan embracing both crimes where proof of one tends to establish the other; evidence of other crimes is not, however, admissible under Oklahoma law to show that the defendant has a propensity to commit crime, *Bryant v. State,* 585 P.2d 377, 380 (Okl.Cr.); *Bond v. State of Oklahoma,* 546 F.2d 1369, 1378 (10th Cir.), and the federal courts have applied a similar rule. *See United States v. Burkhart,* 458 F.2d 201, 204 (10th Cir.).

■■■ The arguments complaining of the evidence of other crimes are not convincing. First, the references to attempted escape (e. g., I R. 932–35) are within the Oklahoma rule that testimony with regard to flight is admissible as showing consciousness of guilt. *Farrar v. State,* 505 P.2d 1355, 1360 (Okl.Cr.). We see no infringement of federal constitutional rights in the showing made by the State of escape efforts.

■■■ We have examined the references to the death of Pete English. (*See* I R. 931–35, 954–57, 1375–78). There is no actual linking of appellant to this homicide. Furthermore, when appellant testified he himself admitted three recent felony convictions for larceny of an automobile, a Dyer Act violation and falsification of a Federal Aviation Administration form. Considering these facts and the matters complained of under this proposition, and the evidence as a whole against appellant, we feel that any error in connection with reference to other crimes or wrongful acts by appellant was harmless beyond a reasonable doubt. *Bond v. State of Oklahoma,* 546 F.2d 1369, 1376–77 (10th Cir.).

The statements concerning the Bliss bombing were perhaps damaging to appellant, but actually did not tie appellant to that event. (*See* I R. 980–81). We have considered also the references to the boat charge against appellant (*see* I R. 850–51) and the general statements in the hypothetical question to Dr. Shadid about appellant escaping responsibility for many crimes for some 10 or 11 years. (*See* I R. 1499–1502). While these references were also of some possible damage to appellant, in view of the overall case against him we feel that the minds of average jurors would not have

found the case significantly less persuasive had these other matters been excluded, and hence any error was harmless beyond a reasonable doubt. *Schneble v. Florida,* 405 U.S. 427, 432, 92 S.Ct. 1056, 31 L.Ed.2d 340; *Bond v. State of Oklahoma,* 546 F.2d at 1376–77.

We thus hold that the contentions made under this proposition are without merit.

## V

### *The Miranda issue*

Appellant claims error in the admission of testimony of several witnesses who testified about prejudicial admissions by appellant, saying that those statements were obtained without proper warnings under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and in violation also of *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. Appellant's brief focuses mainly on the testimony by Highway Patrolman Cantrell but his petition also claims the same error concerning the testimony of several other witnesses.[6]

The only substantial problem concerns the testimony of Highway Patrolman Cantrell about appellant's statements on February 9, 1971. At that time Cantrell and two other officers had appellant in custody in a patrol car on a charge concerning a stolen automobile. Appellant made a statement about the "Bristow bombing". The statement was related by Cantrell at trial (I R. 1080–81):

Q What conversations did you have, if any, with the defendant strictly with regards to the Bolding bombing?

A He stated that they couldn't pin that on him and that a nephew of the Tahlequah Chief of Police had even a few nights previously started out towards Mr. Brinlee's establishment with intentions of killing him and that he said that the nephew knew that he couldn't have done it because he was with him there at The Keg at 12:30 that night.

Q All right. Were there any other statements made at that time in relation to the Bolding bombing?

A None, sir.

█ While this was an in-custody statement made without any advice of rights, we cannot agree that its admission supports a claim for habeas relief. Any error would be harmless because there were other statements by appellant which contained really damaging admissions, made under circumstances which were clearly not custodial interrogations, and they are not subject to any such objections. The Supreme Court has made it clear that "Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714.

We note that on March 23, 1971, Oklahoma State Bureau of Investigation Agent Wilkerson had a conversation with appellant, according to Wilkerson's testimony. (I R. 862–866). Appellant signaled to Wilkerson to stop at Tahlequah that evening, invited him into appellant's pickup, and among other things made statements about the Bristow bombing. Appellant Brinlee said that he had "made a telephone call up north and arranged for the bombing . . ." and that he was confident he could not be convicted for it because only he could "put it all together . . ." The damaging statements appear in the margin.[7] We feel

---

6. Appellant's petition for habeas relief complains on this basis of the admission of testimony by witnesses Steeley, Wilkerson, Elliott, Tilley, Loftin, Randolph and Burris as well as that of Cantrell.

7. Wilkerson testified in part as follows about the March 23 conversation (I R. 863–64; 865; 866):

Q (By Mr. Ferguson) Please explain the details under which you saw him that evening.

A Well, sir, he hailed me by blinking his lights and honking his horn and when I got stopped, I pulled into the parking lot by the side of the Cherokee County Jail. I rolled down my window and he asked me to get in and "let's visit". So—

Q And did you do so?
A Yes, sir.
Q Got in where?
Into his vehicle, a pickup.

\* \* \* \* \* \*

that the circumstances clearly were not such as to show an "in custody" interrogation on this occasion.

We have examined the statements of the several witnesses mentioned above. Statements to Mr. Tilley, like those to Mr. Wilkerson, were clearly not in-custody responses and were more damaging than the statement to Patrolman Cantrell. The overall evidence against appellant is such that we are convinced that any error in the admission of the Cantrell statement was harmless beyond a reasonable doubt. *Schneble v. Florida,* 405 U.S. 427, 428, 92 S.Ct. 1056, 31 L.Ed.2d 340; *Bond v. State of Oklahoma,* supra, *546 F.2d at 1376–77.* In sum, we find no merit in the arguments of appellant on this issue.

## VI

### *The claim of prejudicial conduct by the trial court*

By his appellate brief and his *pro se* petition for habeas relief appellant argues that there were numerous prejudicial comments and actions by the trial judge. He claims that the overall effect of this conduct was to deny him a fair trial in violation of the Sixth and Fourteenth Amendments.

We have considered all of the portions of the record cited in the petition for the writ and the appellate brief. It is true that in isolated instances there were statements which arguably had some prejudicial effect on the appellant. In particular we note that in ruling on an evidentiary objection the trial court stated that the prosecutor had not asked a particular question, that the court "assume[d] that [appellant] lost track of who it was but—but [that] he may, may on purpose [have pretended to have lost track of the person's identity] . ." (I R. 1402). Again appellant points out that in overruling objections to the questioning of witnesses offered as experts, the court made statements that the witnesses were experts or were testifying as experts (*id.* at 711, 775), while the question of acceptance of expert testimony would be up to the jury. The gist of the argument is that the judge thus expressed his conclusion that the experts were qualified and that their testimony should be accepted on this basis. Other more innocuous incidents are complained of and have been considered, but need not be detailed.

It is true that a trial judge should never evince the attitude of an advocate. *Gardner v. United States,* 283 F.2d 580, 581 (10th Cir.). However to sustain an allegation of bias by the trial judge as a ground for habeas relief a petitioner must factually demonstrate that during the trial the judge assumed an attitude which went further than an expression of his personal

Q (By Mr. Ferguson) The Bristow bombing was brought up. Now, did you have any conversation with Mr. Brinlee? Did he make any statements in regards to that, Mr. Wilkerson?

A Yes, sir. He was recounting his difficulties with authorities in the Tahlequah area, talking about how he had been harassed and opposed ever since he had been there not only by the law enforcement people but by the City officials in procurement of various licenses, so he told me, he said, 'I'm going to tell you something that will make you mad'. Then he said, "Maybe it won't make you mad, but it will make your skin crawl." He says, 'I know all about this Bristow thing. I know what was used, where it was placed, how it was placed, and who did it,' but then he went on and said, "Well, I don't know exactly who placed it", said 'but I made a telephone call up north and arranged for the bombing.' He said he never met the people, it was all arranged over the telephone. He said he was confident that he'd never be convicted for it because there was only one person that could put it all together and that was little Rex Brinlee.

\* \* \* \* \* \*

Q Okay. Will you, please—now, did he say anything after that statement in regards to the Bristow bombing?

A Yes, sir. After he said he couldn't be convicted, he—I questioned him as to the mistake in the victim and he said, well, he didn't care, he felt like they had got the message. He said he felt like it was a seventy-percent job because every time Don Bolding rolled over in the night and felt for his wife, he would know that he shouldn't have messed with Rex Brinlee. Well—

opinion and impressed the jury as more than an impartial observer. *Glucksman v. Birns,* 398 F.Supp. 1343, 1350 (S.D.N.Y.). After considering all the claims made and the portions of the case-made cited we are convinced that appellant was not denied the rudimentary requirements of a fair trial. *Pierce v. Page,* 362 F.2d 534, 536 (10th Cir.). Unless they amount to constitutional violations, prejudicial comments and conduct by a judge in a criminal trial are not proper subjects for collateral attack on a conviction. *See Buckelew v. United States,* 575 F.2d 515, 518 (5th Cir.). We are satisfied that no such constitutional wrongs have been demonstrated by these arguments.

## VII

*The claim of error in the admission of evidence of other crimes and in denying a mistrial*

Appellant's petition for habeas relief and his appellate briefs claim error in the admission of evidence of other crimes. Further he argues that the state court erred in denying motions for a mistrial based on the introduction of such evidence.

██ We have considered the record in detail as to the evidence complained of. Similar arguments were considered and held to lack merit in Part IV, *supra.* Now under this Proposition VII stress is particularly laid on the extensive evidence of attempts at escape from the county jail, as well as other evidence. We are satisfied that in the main there was no constitutional error in the admission of the evidence and, if any constitutional error occurred, it was harmless beyond a reasonable doubt.

## VIII

*The claim of insufficiency of the evidence and variance*

██ Appellant's briefs and petition for habeas relief make several arguments challenging the State's evidence. First he says that there was a fundamental error in that the trial court refused to require the State to elect whether it would try the case on the theory that appellant committed the murder or whether he caused it to be done or was guilty as an aider and abetter, that there was a fatal variance, that he was not given notice in accord with the Sixth Amendment requirement that he be informed of the nature and cause of the accusation, and that the proof was wholly insufficient to establish the offense charged. (See Petition for Writ of Habeas Corpus, VI R. 91–94; opening Brief of Appellant, 19–20).

We cannot agree that there was any constitutional error due to lack of notice of the nature and cause of the accusation. The information clearly charged the appellant with acting in concert with others to effect the death of Mrs. Bolding and that he did thereby "cause to be placed and discharged" a certain explosive device. (III R. 4). Moreover there were statements made in the voir dire by the prosecuting attorney which outlined clearly the possibility of an instruction concerning an individual who "aids, assists, abets, procures, or is so concerned in the commission of a felony that he or the crime, (sic) that he would be equally guilty as the one who actually carries it out . . ." (I R. 319). The federal courts instruct in proper cases on aiding and abetting, even though the indictment does not allege violation of the aiding and abetting statute. *See, United States v. Pickens,* 465 F.2d 884, 885 (10th Cir.); *Giraud v. United States,* 348 F.2d 820 (9th Cir.), *cert. denied,* 382 U.S. 1015, 86 S.Ct. 627, 15 L.Ed.2d 529; *Glass v. United States,* 328 F.2d 754 (7th Cir.), *cert. denied,* 377 U.S. 983, 84 S.Ct. 1892, 12 L.Ed.2d 751. Thus we find no substance to the constitutional claim of lack of notice and the related election of theories argument.

With respect to the challenge to the sufficiency of the evidence, the Supreme Court has recently made clear the test we must apply in this habeas challenge to appellant's conviction. The Court held that in such a suit properly brought under 28 U.S.C. § 2254 "the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof

of guilt beyond a reasonable doubt." *Jackson v. Virginia,* —— U.S. ——, ——, 99 S.Ct. 2781, 2792, 61 L.Ed.2d 560.

■■■ Under this constitutional standard there is such proof, we feel, to sustain appellant's conviction. There was a background of motive for the bombing because of the testimony by Don Bolding, the victim's husband, against appellant in another matter—a fact which appellant referred to, according to Agent Wilkerson. (I R. 867). The same witness described comments by appellant about the mistake in the victim but that he felt that Mr. Bolding "got the message." (*Id.* at 866). There was damaging testimony by several witnesses of appellant's admissions of arranging for the bombing. (See the testimony of witnesses Wilkerson, *id.* at 865–873; Elliott, *id.* at 945, 950–51; Tilley, *id.* at 981, 988; and Puckett, *id.* at 1045–46.

In sum we are satisfied that the constitutional standard of proof to support the conviction was satisfied and that there was no constitutional error in connection with the charge as stated in the information or the procedural rulings of the trial court in question.

## IX

### *The claim of error in permitting hypothetical questions and in admitting answers thereto*

Appellant argues again that the state trial court erred in permitting the prosecuting attorney to ask hypothetical questions of the psychiatrist, Dr. Shadid, and in admitting answers to those questions. He says that there was no evidentiary basis for the hypothetical questions and that this evidence also interjected improper references to other alleged crimes.

■■■ It is true that we find no substantial evidentiary basis for the general questions to Dr. Shadid based on the premise that appellant had escaped punishment for criminal acts for some ten or eleven years. We must also agree that there was no sufficient relationship shown between such other crimes allegedly committed and the instant

offense to justify admission of the evidence under the ordinary tests. Nevertheless for the reasons explained fully in Part IV, *supra,* we are satisfied that any error in the rulings and the admission of the evidence in question was harmless beyond a reasonable doubt, in view of the strength of the overall case against the appellant.

## X

### *The claim of error in the trial court's instructions*

Appellant claims error in the instructions given to the jury in several respects. He says that part of the charge emphasized the theory that appellant committed the murder himself, while the court and the prosecutor agreed that this theory was supported by only slight inference; that the charge failed to instruct the jury to disregard reference to 27 other felony charges against appellant mentioned by one state witness; and further that other prejudicial instructions were given.

■■■ We cannot agree that any constitutional error occurred. Habeas proceedings may not be used to set aside a state conviction on the basis of erroneous jury instructions unless the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial in the constitutional sense, *Linebarger v. Oklahoma,* 404 F.2d 1092, 1095 (10th Cir.), *cert. denied,* 394 U.S. 938, 89 S.Ct. 1218, 22 L.Ed.2d 470, or is otherwise constitutionally objectionable as, for example, by transgressing the constitutionally rooted presumption of innocence. *Cool v. United States,* 409 U.S. 100, 104, 93 S.Ct. 354, 34 L.Ed.2d 335. From our review of the entire charge we are satisfied that it covered the basic elements which are constitutionally required such as the burden of the state to prove guilt beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368. No fundamental error amounting to a constitutional wrong is demonstrated in the charge and we find no merit in the arguments challenging the court's instructions.

## XI

*The claim of denial of due process by dismissal of appellant Brinlee's appeal of his murder conviction and ineffective counsel*

Appellant argues strenuously that by the dismissal of his appeal on August 8, 1973, of his murder conviction [8] the State Court acted without authority in the Oklahoma Constitution or statutes; that his life sentence is one calling for automatic review under Oklahoma law; that to this date he has never had a review of his conviction; that this injustice denies him his constitutional rights under the Fifth, Sixth and Fourteenth Amendments; and and that he had ineffective counsel for his appeal, all in violation of his constitutional rights.

At the outset we should define what is and what is not involved on this issue. We feel our only question is whether the dismissal of appellant Brinlee's direct appeal from his murder conviction, on the ground that he had escaped, was in violation of his rights under the Due Process Clause of the Fourteenth Amendment, including his right to effective assistance of counsel as guaranteed by the Sixth Amendment. We do not believe that this claim embraces a claim of denial of constitutional rights because of the state district court's dismissal of appellant's post-conviction proceeding as to ten claims on the ground that his escape had waived those claims which had been raised in his earlier direct appeal; nor does the constitutional claim now before us include a challenge to the affirmance of the dismissal of those post-conviction claims, *see Brinlee*

*v. State,* 554 P.2d 816 (Okl.Cr.), as a denial of due process or other constitutional rights.[9]

■ We are mindful that appellant's *pro se* petition must be held to less stringent standards than formal pleadings drafted by attorneys. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652. Nevertheless we find that the due process claim actually made by appellant under this proposition is directed only against the dismissal of his direct appeal. We do not have the record of his post-conviction case, although details about it are outlined in the opinion affirming the dismissal of appellant's post-conviction case. *See Brinlee v. State,* 554 P.2d 816 (Okl.Cr.). For these reasons, we feel that the constitutional issues before us under this proposition are concerned only with the dismissal of appellant's direct appeal of his murder conviction in *Brinlee v. State,* 513 P.2d 343, on August 8, 1973, and his claim of ineffective counsel in the trial and appeal in that murder case.

■ We must agree with the federal district court that the assertion of ineffective counsel lacks merit. There is complaint about the fact that the direct appeal had not "been filed or completed by the Attorney of record." (VI R. 110). The State had appointed new counsel for appellant because of a difference over financial matters with appellant's retained counsel and at the time of the dismissal the newly appointed counsel had not "completed" the appeal when the July 1973 riot and escape occurred.[10] Nevertheless, the opinion of the

8. See *Brinlee v. State,* 513 P.2d 343 (Okl.Cr.).

9. We note that in stating the facts on this issue appellant's brief before us does say that (Opening Brief of Appellant, 12):

> The Oklahoma Court of Criminal Appeals denied Appellant's appeal and post-conviction appeal on the ground that he had escaped.

That brief does not, however, advance any argument of denial of constitutional rights by the rejection of appellant's post-conviction claims. Moreover in his petition for habeas relief in the federal court appellant does not allege any constitutional wrong by the rejection of his post-conviction claims. His petition (*see*

VI R. 110) complains of lack of authority to support the dismissal ruling, naming the three judges participating in the decision dismissing his direct appeal. The opinion complained of is thus clearly identified—the decision of the Oklahoma Court of Criminal Appeals rendered August 8, 1973, dismissing appellant's direct appeal from his murder conviction, *Brinlee v. State,* 513 P.2d 343.

10. Appellant's petition alleges that when the July 27, 1973, riot broke out "and [the] prison [was] burning down around Rex Brinlee, he left to save his life from being burned up in the disastrous riot." (VI R. 110). The opinion affirming Brinlee's conviction for this escape re-

Oklahoma Court of Criminal Appeals shows that the sole ground of the dismissal of the direct appeal was appellant's escape, *see* 513 P.2d at 344, and the attorney was powerless to prevent this, as the Oklahoma Court pointed out. 554 P.2d at 818.

There is also a complaint in appellant's brief before us that the newspaper clippings on the pretrial publicity issue were not in the record, which is asserted as a claim of ineffectiveness of counsel. However, there is no allegation or showing in the record that counsel was responsible for this circumstance, and we have accepted the proposition that the record shows that there was a substantial amount of publicity surrounding the crime and subsequent events. See Part I, *supra*. We cannot agree that this or other complaints state any substantial claim of denial of effective assistance of counsel in violation of appellant's Sixth Amendment rights.

█ We thus turn to the question whether the Oklahoma Court's dismissal of appellant's direct appeal was a denial of due process or other constitutional rights of appellant. Appellant relies on *Ruetz v. Lash,* 500 F.2d 1225 (7th Cir.) and similar cases. He says that there was no waiver of his rights to the appeal, that the State court cut off his appeal rights two days after his escape,[11] and that there was no deliberate by-pass of State procedures or waiver since his escape occurred during the riot. (Reply Brief of Appellant to Supplemental Brief of Appellees).

█ There is no federal constitutional right to state appellate review of criminal convictions. *Estelle v. Dorrough,* 420 U.S. 534, 536, 95 S.Ct. 1173, 43 L.Ed.2d 377. In *Dorrough* the Court recognized that dis-

missal of pending appeals of escaped prisoners is a long-standing and established principle of American law and that the Supreme Court itself "has long followed the practice of declining to review the convictions of escaped criminal defendants." *Id.* at 537, 95 S.Ct. at 1175.

In *Ruetz v. Lash,* 500 F.2d 1225 (7th Cir.), relied on by appellant, there was a federal habeas action challenging the constitutionality of an Indiana conviction. The Indiana court had refused to allow an appeal because of an escape. This ruling occurred after the defendant had been returned to custody. The Seventh Circuit held that in such circumstances there was no rational basis for such a ruling. *Id.* at 1230. The court reasoned that because the defendant's intention to appeal was apparent when the state court denied the appeal, there was no deliberate by-pass of the orderly procedures of the Indiana courts. *Id.* at 1229.

In the *Ruetz* case, however, the Seventh Circuit recognized that the Supreme Court has determined that it is not a denial of due process for a state court to dismiss an appeal on the ground that the appellant has escaped and become a fugitive from justice. *Id.* at 1229. It seems clear that this general principle is established. *See Allen v. Georgia,* 166 U.S. 138, 17 S.Ct. 525, 41 L.Ed. 949. Similar action was taken by the Supreme Court in *Molinaro v. New Jersey,* 396 U.S. 365, 90 S.Ct. 498, 24 L.Ed.2d 586. And while a grace period for a defendant to return to custody has been allowed before dismissal in some cases, as we did in *United States v. Swigart,* 490 F.2d 914, 915 (10th Cir.), and *United States v. O'Neal,* 453 F.2d 344 (10th Cir.), this seems not to be constitutionally mandated. In *Molinaro* the

---

lates testimony that on August 4, 1973, Oklahoma authorities were conducting an unsuccessful search for appellant and that pursuant to their continued investigation, appellant was located at Gulfport, Mississippi, in the custody of law enforcement officials. On September 21 appellant was transported to Jackson, Mississippi, for an extradition hearing. After that hearing appellant was returned to the Oklahoma State Penitentiary on September 25. *See* 543 P.2d at 746.

11. See appellant's Reply Brief, p. 2. The opinion of the Oklahoma Court of Criminal Appeals does state that the Court had been advised by the Warden that on or about August 6, 1973, appellant "escaped from confinement in the state penitentiary and now remains at large." 513 P.2d at 344. The Court ordered that the appeal be dismissed by its opinion filed August 8, 1973 and issued its mandate forthwith. *See* 513 P.2d at 344.

Court said that "[t]he dismissal need not await the end of the Term or the expiration of a fixed period of time, but should take place at this time." 396 U.S. at 366, 90 S.Ct. at 499. *See also Allen v. Georgia, supra,* 166 U.S. at 142, 17 S.Ct. 525.

It is true that the action by the Oklahoma Court of Criminal Appeals taken within two days of being advised of the escape, and without a grace period, may seem harsh. Nevertheless, under the decisions of the Supreme Court we conclude that the dismissal of the appeal in such circumstances, when appellant was still a fugitive, was not a denial of due process.

We do not, however, go as far as the federal district court in the instant habeas suit with respect to the consequences of the past escapes by appellant on his present *federal* habeas claims.[12] The opinion of the federal district court finds that under the circumstances of the first and second escapes,[13] "petitioner has deliberately bypassed the orderly procedure of state courts and has waived all errors raised in his original appeal." (VI R. 233). The court rejected the reasoning of the Seventh Circuit in *Ruetz v. Lash, supra,* 500 F.2d at 1229, and held that by escaping twice with full knowledge of the possible consequences, under *Fay v. Noia,* 372 U.S. 391, 438, 83 S.Ct. 822, 9 L.Ed.2d 837, the appellant was not entitled to the relief he seeks. *Id.* at 234. The district court therefore concluded that although it had considered ten of appellant's propositions on their merits and found them lacking, those claims should also be denied, irrespective of their merit or lack of merit, on the ground of deliberate bypass of state remedies. (*Id.* at 234).

We cannot agree with the district court's view that there was a deliberate bypass and waiver under *Fay v. Noia,* taking into account the modification of the bypass principles by *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594. This determination of waiver of federal constitutional rights is a federal question. *See Brookhart v. Janis,* 384 U.S. 1, 4, 86 S.Ct. 1245, 16 L.Ed.2d 314. We do not feel that the waiver rule applied with respect to state procedural waivers and possible strategy, *see Wainwright v. Sykes, supra,* 433 U.S. at 87–91, 97 S.Ct. 2497, applies in the circumstances involved here. We conclude that, without more, the circumstances shown on the face of this habeas petition and in our record do not justify a holding that the July 1973 escape was such a bypass of state procedures as to constitute a waiver of *federal* habeas claims. It is for this reason that we have considered all those claims on their merits by examining the record.

In sum, we hold that the Oklahoma Court did not deprive appellant of due process by dismissing his direct appeal in 1973 while he was a fugitive. We hold however that there was no waiver by appellant of all his federal constitutional rights asserted as federal habeas claims and have therefore considered them on their merits.

## XII

### *The claim of use of false and insufficient evidence*

Lastly, appellant argues that the State used false and insufficient testimony

---

12. The Attorney General of Oklahoma urges that we decline to consider the merits of any appellant's federal claims because of waiver. (Brief of Appellees, 5). For reasons stated in the text, we do not follow this suggestion.

13. While the federal district court considered both escapes to be significant on the waiver issue, we note that the Oklahoma Court did *not* attach a waiver consequence to the second escape in 1976, which apparently occurred during appellant's appeal of the dismissal of his post-conviction application. Instead the Court noted that it was stipulated at argument that ap-

pellant was again in custody by the time of argument of the post-conviction appeal. That appeal was not dismissed, despite the State's motion on the ground of the 1976 escape, but was decided on the merits. See 554 P.2d 816. Where the state court does not impose a waiver consequence with respect to state procedure, the federal habeas court should not do so. *See Lefkowitz v. Newsome,* 420 U.S. 283, 292 n.9, 95 S.Ct. 886, 43 L.Ed.2d 196; *Bromley v. Crisp,* 561 F.2d 1351, 1359–60 (10th Cir.), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 499.

to obtain his conviction [14]. He says that the prosecution's original theory in the trial was that he did not personally place the bomb in the Bolding truck, but arranged for the placing of the bomb by others. He argues that testimony by the state prosecutor, Mr. Ferguson, in a 1973 prosecution of appellant under the federal firearms statutes contained an admission by Ferguson that his theory of the murder case had changed, that he had been "100% wrong," and that it cannot be assumed that if other testimony by witness Hinkle had been available for the Okmulgee trial it would have resulted in a murder conviction.

We have examined the testimony of Mr. Ferguson attached to the habeas petition. (VI R. 147–172). It does show that Mr. Ferguson agreed he would have had a different theory if Hinkle had been available as a witness for the State at the Okmulgee trial. Hinkle's testimony is not before us. However, it is not alleged or shown how his testimony would have benefited the appellant. *See Brinlee v. United States*, 496 F.2d 351, 353 (8th Cir.) (damaging testimony by witness Hinkle on Brinlee's participation in the Bristow bombing summarized). Thus the argument is not persuasive on the facts or the law. In any event, there is no allegation or showing of any use of false evidence, known to be such by the representatives of the State. *See Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217. We find no merit in the claim of constitutional error asserted in this final proposition.

We have considered the merits of all of appellant's arguments and the record of the state court proceedings and the habeas record before us. We are satisfied that no constitutional infirmity in the state court conviction has been demonstrated by appellant's arguments on the record. The judgment of the district court denying federal habeas relief is accordingly

AFFIRMED.

14. This claim is one of the post-conviction claims of appellant which was considered on the merits but rejected by the Oklahoma Court of Criminal Appeals. See 554 P.2d at 818–19. The other claims rejected for lack of merit were the claims that dismissal of his direct appeal of his murder conviction was a denial of due process and that he had ineffective counsel for the original appeal, which we discussed in Part XI, *supra*.

APPENDIX

The voir dire of juror Butler was as follows (I R. 158–163, 260 through 263):

THE COURT CLERK: Ted Butler.

THE COURT: All right. You may examine.

MR. FERGUSON [Prosecuting Attorney]:

Thank you, Your Honor.

What is your occupation or employment, please, Mr. Butler?

JUROR BUTLER: I work for the Social Security Administration.

MR. FERGUSON: And here in Okmulgee?

JUROR BUTLER: Yes, here in Okmulgee and in Muskogee.

MR. FERGUSON: And Muskogee, and how long have you been employed in that capacity?

JUROR BUTLER: Six years.

MR. FERGUSON: Six years. Has all of your employment been here in Okmulgee or Muskogee with the Administration?

JUROR BUTLER: No, sir. It's been in Ponca City and Enid and Oklahoma City, also.

MR. FERGUSON: All in Oklahoma?

JUROR BUTLER: Yes, sir.

MR. FERGUSON: All right, sir. And are you a native resident of this county?

JUROR BUTLER: Yes, sir.

MR. FERGUSON: And the only time that you've been gone then is in the last six years during those different assignments; is that correct, sir?

JUROR BUTLER: Yes, sir.

MR. FERGUSON: And what does your family consist of, please, sir?

JUROR BUTLER: Wife and two small children.

MR. FERGUSON: All right. And are you acquainted with the defendant or any of the counsel in this case, sir?

JUROR BUTLER: No, sir.

MR. FERGUSON: All right. Any of the witnesses that were read? Were you familiar with any of those individuals?

JUROR BUTLER: No, sir.

MR. FERGUSON: The fact that you work for the Social Security Administration and there were certain, several individuals named from Muskogee as agents with the Treasury Department, ATF Division, you're not acquainted with any of those individuals?

JUROR BUTLER: No, sir.

MR. FERGUSON: Okay. Now, Mr. Butler, the State of Oklahoma has the burden of proving this defendant guilty beyond a reasonable doubt before you could, in good conscience, exercising your oath as a juror, return a verdict of guilty. You understand that, sir?

JUROR BUTLER: Yes, sir.

MR. FERGUSON: And you further understand that the defendant is charged with the crime of murder?

JUROR BUTLER: Yes, sir.

MR. FERGUSON: And you understand that the laws of the State of Oklahoma provide that upon a conviction of murder there are only two penalties, either death or life imprisonment?

JUROR BUTLER: Yes, sir.

MR. FERGUSON: You understand that. If the State of Oklahoma establishes to your satisfaction beyond a reasonable doubt that the defendant, Garland Rex Brinlee, Jr., is guilty of the crime of murder, could you consider both of those penalties?

JUROR BUTLER: Yes, sir.

MR. FERGUSON: All right, sir. Could you, sir,—have you read or heard anything about what purports to be the facts in this case, sir?

JUROR BUTLER: Yes, sir, I've heard of the case.

MR. FERGUSON: All right. Can you, sir, listen to the evidence from the witness stand and the instructions of the Court and base your decision on that and that entirely alone?

JUROR BUTLER: Yes, sir.

MR. FERGUSON: In other words, if something should occur later during the course of the trial that is not brought out in evidence, then, you could place that out of your mind, Mr. Butler?

JUROR BUTLER: Yes, sir.

MR. FERGUSON: What you read or what you heard; is that correct?

JUROR BUTLER: Yes, sir.

MR. FERGUSON: Then you can, in good conscience, state that you do not have a fixed opinion at this time as far as the guilt or innocence of this defendant is concerned?

JUROR BUTLER: Yes, sir.

MR. FERGUSON: Have you ever had any prior jury service?

JUROR BUTLER: No, sir.

MR. FERGUSON: And were you in a position in the courtroom where you could hear the explanation to the entire panel here so far as trial procedure was concerned?

JUROR BUTLER: Yes, sir.

MR. FERGUSON: And you feel like this is a good system of justice that we have to determine the guilt or innocence of a man in this type of situation?

JUROR BUTLER: Yes, sir.

MR. FERGUSON: Do you feel that you can, in good conscience, follow all of the instructions of the Court if they are so given, including those in regards to circumstantial evidence, aiding, and assisting, and abetting, and attempted flight showing a consciousness of guilt if the Court gives those instructions?

JUROR BUTLER: Yes, sir.

MR. FERGUSON: You feel that you can take all of the instructions of the Court and apply them to the evidence and not single out any particular instruction on which to base your verdict?

JUROR BUTLER: Yes, sir.

MR. FERGUSON: You feel that you can do that, sir?

JUROR BUTLER: (Juror nods head up and down.)

MR. FERGUSON: And will you place yourself in a position of listening to each witness that testifies in determining through your common sense the candor and fairness and intelligence of that witness and take into consideration the interest or result or outcome that they would have in the trial and base your decision on that if the Court so instructs?

JUROR BUTLER: Yes, sir.

MR. FERGUSON: Have you ever had any unpleasant experience with any law enforcement officer that would cause you to give less credence to their testimony than any other witness?

JUROR BUTLER: No, sir.

MR. FERGUSON: All right, sir. Have you ever been convicted of a crime?

JUROR BUTLER: No, sir.

MR. FERGUSON: You feel, then, that you can give both the defendant, Garland Rex Brinlee, Jr., and the State of Oklahoma a fair and impartial trial in this case, sir?

JUROR BUTLER: I certainly hope so, sir.

\* \* \* \* \* \*

MR. BROWN [Defense Attorney]: All right.

Mr. Butler, you heard those questions that I just asked Mr. Crider, did you not?

JUROR BUTLER: Yes, sir.

MR. BROWN: Would your answers be any different at all?

JUROR BUTLER: No, sir.

MR. BROWN: You feel that's good law?

JUROR BUTLER: Yes, sir, I certainly do.

MR. BROWN: You did read and hear about this matter on television, didn't you?

JUROR BUTLER: Yes, sir, very little.

MR. BROWN: How long have you lived here in the Okmulgee area?

JUROR BUTLER: Over four years.

MR. BROWN: And prior to that time where did you live?

JUROR BUTLER: In Ponca City.

MR. BROWN: As a result of what you read or saw, did you determine an opinion as to Brinlee's guilt or innocence?

JUROR BUTLER: No, sir.

MR. BROWN: Well, now, you hesitate.

JUROR BUTLER: Not really.

MR. BROWN: Not really?

JUROR BUTLER: Not a fixed opinion.

MR. BROWN: Not a fixed opinion. I take it, then, you did consider pretty carefully what you read or saw, did you not?

JUROR BUTLER: Yes, sir, I really—all I have been acquainted with through the news is the fact that he's been accused and arrested. I don't recall reading or seeing anything that listed any sort of evidence. I don't have any idea of what evidence there is, if any.

MR. BROWN: All right. Now, of course, you can appreciate the fact that evidence is proof that comes out in a court of law?

JUROR BUTLER: Yes, sir.

MR. BROWN: Not in the newspapers or on television or anything. Now, you say you didn't really form a fixed opinion. I take it, then, you do have some opinion, is that correct, as to the guilt or innocence of that defendant?

JUROR BUTLER: Yes, sir. I suppose that I do. The fact that we're here would tend to point in one direction or another.

MR. BROWN: All right. Do you feel then that simply because a man is charged with a crime but had there not been, that, were it not for the fact that he's guilty or—let me rephrase that and make it clear to you.

Do you feel that the State doesn't charge people of crimes who are innocent?

JUROR BUTLER: I hope that they don't, but I feel that it can happen and does happen.

MR. BROWN: Well, now, let me ask you this: Can you state in your own mind at this time that you presume Mr. Brinlee to be innocent of this charge?

JUROR BUTLER: Yes, sir.

MR. BROWN: All right. Now, this opinion that you're talking about, it was an opinion you told us that was one of guilt or innocence; is that correct?

JUROR BUTLER: Yes, sir.

MR. BROWN: But it was not a fixed opinion?

JUROR BUTLER: Yes, sir.

MR. BROWN: Is this opinion such that it would take some kind of evidence to remove it?

JUROR BUTLER: No, sir, it would take evidence by the State to fix the opinion. I agree with what you said before that Mr. Brinlee doesn't have to do anything.

MR. BROWN: All right. In other words, your opinion is the man's innocent?

JUROR BUTLER: Yes, sir.

MR. BROWN: All right. And if the Court tells you that's the law and that's the frame of mind you ought to be in, that's the frame of mind you're in; is that correct?

JUROR BUTLER: Yes, sir.

MR. BROWN: And that it's going to take evidence and not just any evidence but substantial evidence beyond any reasonable doubt to convict him; is that right?

JUROR BUTLER: Yes, sir.